[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the Judicial District of Danbury. Many of the facts that give rise to this action are not in dispute. The plaintiff and the defendant, whose maiden name was Christina Batista, were married on January 25, 1986, in Danbury, Connecticut. The parties have resided continuously in the State of Connecticut for at least twelve (12) months immediately prior to the date of the filing of the complaint. The plaintiff and the defendant have one minor child, issue of the marriage, Alexander Morgado, born June 10, 1989. No other minor children have been born to the defendant wife since the date of the marriage of the parties. Neither of the parties has received assistance from the State of Connecticut.
The parties are in dispute as to whether the marriage has broken down irretrievably. From the evidence presented, the court finds that the marriage between the parties has broken down irretrievably and that there is no reasonable prospects for reconciliation. The parties are further in dispute as to the cause of the breakdown of the marriage. The court finds the following facts regarding the cause of the breakdown of the marriage.
In late April, 1993, the plaintiff started to date Hazel Dusky. He started to live with her in September of 1994. He has lived together with her since September of 1994. The plaintiff and defendant separated in July of 1994. The plaintiff did not tell the defendant that he was having an CT Page 2532 affair with Hazel Dusky between May, 1993, and July, 1994. The plaintiff and the defendant continued to have sexual relations between May of 1993 and approximately June of 1994, during which time the plaintiff was also having sexual relations with Hazel Dusky.
Since meeting Hazel Dusky, the plaintiff has gone on a number of vacations and trips with her, including the following:
A. Cape Cod — for a few times. Each of those trips lasted approximately three days and were all after he left the family residence in July of 1994.
B. A dude ranch near Lake George for a weekend.
C. Numerous day trips to New York City.
D. A California trip in 1995 for one week.
The court finds from the evidence presented that the sole cause of the breakdown of the marriage is the plaintiff's relationship with Hazel Dusky.
The parties met in Portugal at the wedding of the defendant's brother. The defendant was eighteen (18) years old when she met the plaintiff. The plaintiff saw the defendant twice when he was in Portugal during the three weeks he remained there, once at the wedding, and the second time at the home of the defendant's parents. After the plaintiff returned to the United States, the parties corresponded by letter. The defendant then came to the United States under a ninety (90) day visa to marry the plaintiff. The parties were married approximately six weeks after the defendant entered the United States by a Justice of the Peace. The plaintiff claims that he felt pressured to enter into that marriage by his younger brother and parents. His younger brother was fifteen years old at the time he married the defendant. The court finds that his claim that he felt pressured to enter into the marriage is not credible. The parties commenced to plan for a church wedding when the defendant first arrived in the United States. The church wedding took place on July 12, 1986. The parties did not live together until after the church wedding. Following the church wedding, the parties resided in one of the apartments owned by the plaintiff's CT Page 2533 father until the plaintiff vacated the apartment in July of 1994. The defendant and the minor child continue to reside in an apartment owned by the plaintiff's parents. The defendant was in good health prior to the birth of the minor child. She was hospitalized approximately seven to eight months after the minor child was born at the Danbury Hospital for stress and depression where she remained in the psychiatric ward for approximately eleven days. The defendant was also hospitalized on one occasion for appendicitis.
The defendant became a United States citizen approximately three years ago.
The defendant is thirty (30) years old. She went to school until age eleven (11) in Portugal, and then dropped out of school. She commenced working in Portugal at age sixteen (16) as a seamstress. The only work that she did when she lived in Portugal was as a seamstress. She worked continuously in Portugal from age sixteen (16) until she came to the United States. The defendant became a United States citizen prior to the time the minor child was born. The defendant still suffers from depression and sees a psychiatrist regularly and takes medication regularly for the last four years. The defendant considers the true marriage date to be the date of the church wedding on July 12, 1986.
The plaintiff claims that the parties had an arranged marriage. The court finds that that claim is not credible.
The defendant has been employed throughout the marriage. She did not work for a few months when she was hospitalized for her stress and depression. She worked for approximately one month prior to the time the minor child was born. She took off approximately three months for the birth of that child.
The defendant has been employed for approximately the past three years at Fairfield Precision doing assembly work and sewing. The defendant is paid at the rate of $8.50 hourly. Her gross weekly income is $344 and her net weekly income is $262.45. She presently pays rent to the plaintiff's parents in the amount of approximately $150 monthly for the apartment she occupies with the minor child. The fair rental for the apartment would be approximately $700 monthly. In addition to working, she's been responsible for maintaining CT Page 2534 the family residence and caring for the minor child. The defendant's work schedule consists of leaving the home at about 6:30 a.m. Monday through Friday, and returning home at approximately 3:45 p.m. She works a forty (40) hour week and obtains a minimal amount of overtime. She brings the minor child to the residence of her in-laws, and her father-in-law brings the minor child to school. After school, a baby sitter, who resides in the same residence as does the defendant, watches the child until the defendant returns home from work. The defendant pays $25 weekly to the baby sitter. She returns home from work approximately 50 minutes after the child arrives home.
The plaintiff's parents gave the defendant $1000 to be used for an initial retainer for an attorney. Her financial affidavit lists under liabilities the names of her husband's parents for back rent for $11,000. There is no reason to believe her in-laws will seek to recover the difference between the fair rental value of $700 for the apartment she occupies and the $150 that she has been paying for the past twenty months.
The wife's financial affidavit shows tuition for the minor child of $59.01 weekly. The correct amount of that tuition is $39 weekly. She also shows uniforms of $13.15 weekly. The correct amount for the uniforms is $2.14 weekly.
The wife pays for her own automobile insurance at a cost of approximately $800 annually. That expense was erroneously omitted from her financial affidavit.
The plaintiff completed twelfth grade in high school. He speaks and understands Portuguese, but cannot write it.
The plaintiff was employed by the Danbury Hospital on April 18, 1994. He continues to be employed there. Prior to April 18, 1994, he was employed doing plumbing, heating, air conditioning and ventilation work. His work at the Danbury Hospital involves plumbing and heating. His current hourly rate at the Danbury Hospital is $18.03 and he is scheduled to work forty (40) hours per week. He also works overtime at the Danbury Hospital. His gross earnings at the Danbury Hospital for 1994 was $25,778.10. A breakdown of those earnings is as follows: CT Page 2535
Regular Hrs. 1,395.00 Regular 24,412.50 O.T. Hrs. 30.50 O.T. Hrs. $ 270.35 Eve. Shift Hrs. 30.50 Eve. Shift $ 30.50 Night Shift Hrs. 43.50 Night Shift Hrs. 58.75 W/E Hrs. 12.00 W/E $ 36.00 Holiday Hrs. 56.00 Holiday $ 980.00
Total 24,788.10
His gross earnings for 1995 at Danbury Hospital was $39,611.28. The breakdown of those earnings is as follows:
Regular Hrs. 1,855.25 Regular $ 33,137.63 O.T. Hrs. 64.75 O.T. $ 601.33 Eve. Shift Hrs. 19.00 Eve. Shift $ 19.00 Night Shift Hrs. 20.00 Night Shift $ 27.01 W/E Hrs. 151.75 W/E $ 455.25 Holiday Hrs. 96.00 Holiday $ 1,707.56 Sick Hrs. 85.00 Sick $ 1,511.35 Vacation Hrs. 104.50 Vacation $ 1,867.18 Holiday Prem. Hrs. 12.50 Hol. Prem. $ 114.17 Call $ 136.64 Retro. Pay 34.16
Total $39,611.28
His 1996 gross earnings as of the period ending March 2, 1996 was $8,888.32. The breakdown for those earnings is as follows:
Regular Hrs. 407.00 Regular $ 7,338.22 O.T. Hrs. 49.50 O.T. $ 465.67 Eve. Shift Hrs. 31.50 Eve. Shift $ 31.50 Night Shft. Hrs. 6.00 Night Shft. $ 8.11 W/E Hrs. 25.00 W/E $ 75.00 Holiday Hrs. 32.00 Holiday $ 576.96 Vacation Hrs. 18.00 Vacation $ 324.54 Call $ 68.32
Total $8,888.32
In determining financial orders, the court has combined the 1995 gross earnings of the plaintiff, together with the gross earnings for the period ending March 2, 1996, less the appropriate deductions. His gross weekly income, including CT Page 2536 $25 weekly in side jobs, is $804. His net weekly income is $576.66.
The plaintiff was employed at the time the parties' married, and has been continuously employed since then, except for the period of April, 1993 to April 1994, when he was unemployed. The husband's work hours are presently Monday through Friday 7:30 a.m. to 4 p.m. He also works overtime.
The husband's financial affidavit also shows that he is employed doing side jobs earning $25 weekly. He does some occasional plumbing and heating work for which he receives this money. Eighty (80) percent of the time he does the side job work on weekends. The husband's financial affidavit shows various Union Savings Bank I.R.A.'s with a total value of $32,945.69. There are a total of eight I.R.A.'s. The following chart shows those I.R.A.'s by account number, balance as of February 15, 1996, and date opened. Each I.R.A. was opened with an initial $2000 deposit:
Acct. No. Balance as of 2/15/96 Date Opened
0031000341 5,398.10 7/23/83 0031000631 4,355.47 2/16/85 0031000619 4,424.53 1/5/85 0031000135 5,853.54 7/27/82 0031001183 2,747.33 4/6/90 0034000704 3,186.69 4/8/89 0031001047 3,482.86 3/4/88 0031000960 3,497.17 3/14/87
The parties had another account at Union Savings Bank that was opened on July 16, 1990, with a deposit of $16,878.40. It was from this account that the $8000 payment was made to the defendant's parents on December 18, 1992. That withdrawal reduced the balance in the account to $11,793.36. The balance in the account as of July 18, 1994 was $12,576.45. The plaintiff withdrew that full balance on July 18, 1994, shortly before the parties separated. Eight hundred seven dollars and forty ($807.40) cents of that withdrawal was used for a payment made to Household Credit Service by check dated July 18, 1994. Three thousand five hundred ($3,500) dollars of that withdrawal was used for payment by the plaintiff to his first attorney by check dated July 18, 1994. Four thousand six hundred fifty-one dollars CT Page 2537 and fifty-five ($4,651.55) cents was deposited on July 18, 1994 into an account at Union Savings Bank, account No. 1014036, that was in the name of "Manuel Morgado, ITF Alexander Morgado." That account was not set up under the Uniform Gift to Minor Act. The balance of the $12,576.45 withdrawal was divided equally between the plaintiff and the defendant. The defendant kept his one-half and deposited the other one-half into a joint savings account with the defendant. The account in the name of "Manuel Morgado, ITF Alexander Morgado" was commenced on September 1, 1989, with a $2000 deposit. The plaintiff withdrew the following sums from that account.
Date Amount
 2/28/94 $1,425.55 3/2/94 500.00 3/5/94 300.00 3/10/94 760.00 3/11/94 300.00 4/11/94 350.00 4/13/94 211.00 6/3/94 170.00
The withdrawals made by the plaintiff were used to replace a truck engine on the 1986 Chevrolet truck that he shows on his financial affidavit as having a value of $2000. The $4651.55 deposit to that account on July 18, 1994 was to replace the funds that he withdrew.
The plaintiff pays his girlfriend $50 a week since September, 1994, as rent for her apartment that he occupies with her. His name is not on the lease. He does not contribute to any of the utilities. The plaintiff presently pays $119.30 on an automobile loan. He obtained that loan in July or August of 1994, when he purchased a new 1994 Chevrolet pickup shortly after he vacated the family residence. The plaintiff has a Discover card, that is in his name only, with a balance of $4000. The balance on that card in September, 1994, was $280. The plaintiff charged the additional $3720 to the card since the parties separated. Part of the additional Discover Card liability is as a result of cash advances that he obtained. He also has a Union Savings Mastercard with a balance of $2200. In September, 1994, that balance was $440. The additional amount incurred was a result of cash advances CT Page 2538 as well as for clothing, all of which was for the benefit of the plaintiff. His current financial affidavit, dated March 14, 1996, also shows a liability to Harris Bank Mastercard and Visa with a balance of $3300. His September, 1994 financial affidavit showed that balance to be $8300. The court finds that the September, 1994 financial affidavit amount of $8300 was in error, and the correct amount due as of September, 1994, on that account was approximately $3,300. His current financial affidavit also shows a liability to Household Finance, with a balance of $4409. That account is in his name only. There was no such liability in September, 1994. Part of that liability was incurred for paying fees to his current attorney, and part of it was incurred for vacations and long weekend trips.
On December 18, 1992, $8000 was advanced to the defendant's parents to be used by them to purchase a home in Portugal. That money has not been repaid by them.
The husband's current financial affidavit does not reflect under "all other assets" any claim that he has against his mother-in-law and father-in-law for the repayment of the $8000 advance to them. He does not expect to be repaid that money. The funds came from a certificate of deposit that was accumulated from the both the plaintiff and the defendant.
The husband's current financial affidavit shows a 1994 Chevrolet pickup with a value of $21,000. That vehicle cost him $28,000 to $30,000 when originally purchased. His current financial affidavit also shows a liability to Sears in the amount of $900, which did not exist in September, 1994. That was as a result of his tools having been stolen and having to purchase replacement tools. He also purchased a new dish washer.
The plaintiff's present visitation schedule with the child is on Tuesdays and Thursdays from 5 p.m. to 7 p.m. He voluntarily agreed not to have the child have any contact with his girlfriend Hazel Dusky. The plaintiff has an excellent relationship with his child and does many activities with him.
The minor child is presently enrolled in parochial school. Both parties agree that the child continue to be enrolled in parochial school. The tuition at Sacred Heart is CT Page 2539 $170 monthly based on a twelve month payment. In addition, there is an annual cost of uniforms for $125.
The child's present bedtime is 8 p.m.
The plaintiff presently provides health insurance and dental insurance for the minor child. The defendant also provides health insurance currently for the minor child.
The defendant attends Mass. at a local Catholic church regularly. The minor child is being brought up as a Catholic. He is brought to Mass. every Sunday morning to attend a special Mass. for children. The Sunday Mass. that the minor child attends lasts from 9:30 a.m. to 10:30 a.m. Children participate in this Mass.
The plaintiff has paid his current attorney $2000. He also received part of the $3500 back that he paid to his first attorney and used that refund to pay to his current attorney. This court has considered the provisions of § 46b-82 regarding the issues of alimony, and has considered the provisions of §46b-81 (c) regarding the issues of property division, and has considered the provision of § 46b-56 and 46b-56a regarding the issue of custody and visitation, and has considered the provision of § 46b-84 and the child support guidelines regarding the issue of support, and has considered the provisions of § 46b-62 regarding the issue of attorney's fees. The court enters the following orders:
BY WAY OF DISSOLUTION
The marriage between the parties is dissolved and each party is declared to be single and unmarried.
BY WAY OF CUSTODY AND VISITATION
1. The wife shall have sole custody of the child.
2. The husband shall have the following rights of visitation:
A. WEEKEND
(a) Two consecutive Saturdays from 12 noon until 5 p.m. CT Page 2540
(b) Two consecutive Sundays from 11 a.m. until 7 p.m.
B. WEEK DAY
(c) Thursday of each week from 4:30 p.m. to 7 p.m.
C. HOLIDAY
(d) Each Mother's Day to be with the defendant.
(e) Each Father's Day to be with the plaintiff.
 (f) In odd numbered years, the plaintiff will have the holidays of Easter, July 4th, Thanksgiving and Christmas Day.
 (g) In even numbered years, the plaintiff will have the holidays of Memorial Day, Labor Day and Christmas Eve. All hours of holiday visitation shall be from 9 a.m. until 7 p.m., except when the holiday falls on a school day the hours of visitation shall be from 4 p.m. to 7 p.m.
 (h) The plaintiff shall have the right to visit with the minor child on his birthday from 9 a.m. to 1 p.m.
 (i) The holiday visitation shall take precedence over the weekend, week day and vacation schedule.
D. VACATION
 (j) The plaintiff is permitted two weeks vacation time with the minor child when school is not in session, which two weeks may not be consecutive and shall be separated by at least a one week period. Such time may not interfere with the holiday visitation schedule. Such vacation time shall take precedence over the weekend visitation period. Until such time as the plaintiff has overnight visitation, such visitation shall be from 9 a.m. to 7 p.m. each day. The plaintiff is to give to the defendant advance written notice by registered mail, return receipt, CT Page 2541 or certified mail, return receipt, at least ninety (90) days in advance of the two week vacation period that he elects.
BY WAY OF SUPPORT
The parties are in dispute as to how to calculate the amount of support to be paid by the defendant to the plaintiff. The court finds that in view of the fluctuating amount of overtime pay, holiday pay, and other forms of supplemental pay that the plaintiff receives, that it is appropriate to use his combined 1995 and 1996 income through March 6, 1996 in calculating the amount of support due from him. The court finds, in accordance with the support guideline worksheet prepared by the plaintiff, that the amount of support under the guidelines would be $133.41 per week. The court is entering an order in substantial compliance with the guidelines and orders that the plaintiff pay to the defendant as support the sum of $135 per week. An immediate wage execution is authorized. The plaintiff is ordered to provide health insurance including dental for the minor child. The parties have to divide equally any uncovered or unreimbursed health expenses for the minor child.
BY WAY OF ALIMONY
The plaintiff is ordered to pay to the defendant alimony in the sum of $50 per week. Alimony is to terminate on the earliest of the following events:
1. The death of the plaintiff.
2. The death of the defendant.
3. The remarriage of the defendant.
4. When the child turns eighteen (18) on June 10, 2007. The defendant's need for additional funds will be reduced when the minor child turns eighteen (18), and therefore her need for alimony will not be as great.
5. Alimony is nonmodifiable as to term. The provisions of §§ 46b-86(a) and 46b-86(b) are applicable.
BY WAY OF PROPERTY ORDERS
CT Page 2542
1. The court orders that the plaintiff pay all the liabilities shown on his financial affidavit dated March 14, 1996, and hold the defendant harmless therefrom.
2. The court orders that the defendant pay all the liabilities shown on her financial affidavit dated March 14, 1996, and hold the plaintiff harmless therefrom.
3. The two motor vehicles shown on the plaintiff's financial affidavit are awarded to the plaintiff. He is to hold the defendant harmless from the loan balance on the Chevrolet pickup vehicle.
4. The Union Savings Bank checking account shown on the plaintiff's financial is awarded to the plaintiff.
5. The Union Savings bank account held in trust for the minor child is ordered divided equally between the parties.
6. The defendant is awarded the eleven shares of Nutmeg Federal Savings shown on the plaintiff's financial affidavit with a value of $38.50.
7. The tax shelter annuity shown on the plaintiff's financial affidavit with Travelers is ordered divided equally between the parties.
8. The motor vehicle shown on the defendant's financial affidavit is awarded to the defendant.
9. All personal property in each parties' possession is awarded to such party except:
 (a) an office chair and filing cabinet in the defendant's possession is awarded to the plaintiff;
 (b) a camera in the plaintiff's possession is awarded to the defendant.
10. The Union Savings bank account shown on the defendant's financial affidavit with a balance of $300 is awarded to the defendant.
11. The I.R.A. shown on the defendant's financial CT Page 2543 affidavit with a balance of $4125.38 is awarded to the defendant.
12. The following accounts at the Union Savings Bank are awarded to the defendant: Account Nos. 0031001183, 003400704, 0031001047, 0031000960. The following accounts at the Union Savings Bank are awarded solely to the plaintiff: Account Nos. 0031000341, 0031000631, 0031000619, 0031000135.
13. Any claim that either of the plaintiff or the defendant may have against the defendant's parents regarding the $8000 is awarded to the defendant.
BY WAY OF ATTORNEY'S FEES
1. No attorney's fees are awarded in favor of either the plaintiff or the defendant.
2. The court awards $3375 as counsel fees for counsel for the minor child, and orders each party to pay one-half within thirty (30) days from today's date.
MISCELLANEOUS ORDERS
1. The parties are ordered to exchange copies of their federal and state income tax returns within thirty (30) days after such returns have been filed, by certified mail, return receipt or registered mail, return receipt, for so long as there is an outstanding support and/or alimony order.
2. The plaintiff shall have the right to claim the minor child as an exemption for federal and state income tax purposes for each calendar year in which he is current in his alimony and support payments at the end of such calendar year.
3. Counsel for the plaintiff is to prepare the judgment file within thirty (30) days, and send it to counsel for the defendant for signature and filing.
Axelrod, J.